# EXHIBIT 1

Filing # 157959704 E-Filed 09/22/2022 02:24:14 PM

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.   CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>SEVENTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>BROWARD</u>   COUNTY, FLORIDA

<u>Kimberly Maus, Luan Malushi, Francisco Vetancourt, Richard Fortunato</u>
Plaintiff                                                                     Case # _____
                                                                                    Judge _____

vs.
<u>City of Fort Lauderdale</u>
Defendant

### II.   AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.   TYPE OF CASE   (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐ Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
☒ Other
       ☐ Antitrust/Trade regulation
       ☐ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☒ Discrimination—employment or other
       ☐ Insurance claims
       ☐ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [ ]
(Specify)

  <u>8</u>

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Tonja Haddad Coleman</u>      Fla. Bar # <u>176737</u>
        Attorney or party               (Bar # if attorney)

<u>Tonja Haddad Coleman</u>           <u>09/22/2022</u>
  (type or print name)         Date

Filing # 157959704 E-Filed 09/22/2022 02:24:14 PM

IN THE CIRCUIT COURT FOR THE
SEVENTEENTH JUDICIAL CIRCUIT, IN
AND FOR BROWARD COUNTY,
FLORIDA

KIMBERLY MAUS, LUAN MALUSHI,
RICHARD FORTUNATO, and                    CASE NO.:
FRANCISCO VETANCOURT,

           Plaintiffs,                    JUDGE:

vs.

CITY OF FORT LAUDERDALE,

           Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Kimberly Maus ("Maus"), Luan Malushi ("Malushi"), Richard Fortunato

("Fortunato"), and Francisco Vetancourt ("Vetancourt"), by and through their undersigned counsel,

hereby file this Complaint against Defendant, the City of Fort Lauderdale (hereinafter "the City"),

and state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      This is an action brought pursuant to the Florida Civil Rights Act of 1992 ("FCRA")

and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII")

by a white, female Lieutenant (now Captain) of the City for the Fort Lauderdale Police Department,

and three white male Sergeants (now Lieutenants) of the City of Fort Lauderdale Police Department

("FLPD") who were wrongfully discriminated against and skipped for promotion by a newly-hired

black police chief, Larry Scirotto ("Scirotto"), who desired to have his command staff mirror

himself, and admitted as much. Plaintiffs sue for race and gender discrimination.

2.      Jurisdiction, including concurrent jurisdiction over the Title VII claims, is

1

conferred upon this Court pursuant to § 26.012 of the *Florida Statutes*, § 760.10 of the *Florida Statutes*, Article I, Section 23, of the *Florida Constitution*, and 42 U.S.C. § 2000e et seq.

3.      Venue is proper because the events or omissions giving rise to the cause of action occurred in Broward County, Florida.

4.      Plaintiffs were and continue to be citizens of the United States and employed in Broward County, Florida.

5.      Plaintiffs were, and currently are, employees of the City of Fort Lauderdale, located in Broward County, Florida.

6.      Defendant's main headquarters were and are located in Fort Lauderdale, Broward County, Florida.

7.      Defendant conducts and transacts business in Broward County, Florida and is a Florida municipal corporation. The City at all material times was and is an employer as defined by § 760.02(7) of the *Florida Statutes*.

8.      Defendant is a person within the meaning of 42 U.S.C. § 2000e(a) and an employer within the meaning of 42 U.S.C. § 2000e(b).

9.      On or about December 22, 2021, Plaintiffs each timely filed a Charge of Discrimination with the FCHR and the EEOC. More than one hundred-eighty (180) days have elapsed after the filing of the Charges of Discrimination without the FCHR's either conciliating any of the matters or making a finding adverse to Plaintiffs, thereby entitling Plaintiffs to maintain this action. A right to sue letter for each Plaintiff was received from the Department of Justice ("DOJ") on or about September 19, 2022.

10.     All conditions precedent to the bringing of this action have been performed.

11.     Each Plaintiff is protected by:

2

a. The race and sex discrimination provisions of the FCRA;

b. Article I, § 2 of the *Florida Constitution*, which makes freedom from governmental race discrimination a fundamental right; and

c. Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e, et seq.

## GOVERNING LAW

12.     Section 760.10(1) of the *Florida Statutes* provides in relevant part:

It is an unlawful employment practice for an employer:

(b)     To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, ... sex, ... national origin [or] age . . .

§ 768.10(1) FLA. STAT. (2022).

13.     Freedom from racial or national origin discrimination is a fundamental right under Art. I, § 2 of the *Florida Constitution.*

14.     Section 760.11(6) of the *Florida Statutes* declares that a prevailing plaintiff in an action under the FCRA may recover her reasonable attorney's fees and litigation expenses.

15.     Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e–2 governs unlawful employment practices and provides in relevant part that

It shall be an unlawful employment practice for an employer-

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2. Title VII 42 U.S. Code § 2000e–5 also permits a prevailing plaintiff in an action under Title VII to recover her reasonable attorney's fees and litigation expenses.

3

## FACTS COMMON TO ALL COUNTS

16.     Larry Scirotto, who is black, became the chief of police for the City in June 2021, and immediately established that promoting blacks and "people like him" was a priority, and did so at the expense of white males and females who had earned their rank and positions following years of service.

17.     Scirotto, at all times material, acted toward Plaintiffs based on the authority vested in him as chief of police of the City, and the City's management and policy makers acquiesced in and ratified his treatment of Plaintiffs; some applauded and encouraged it from the dais in City meetings and in media outlets.

18.     Scirotto began promoting off of the eligible/extended Captain and Lieutenant lists in August 2021, skipping the Plaintiffs based upon race and gender.

19.     In October 2021, all four Plaintiffs filed a grievance with the City, alleging discrimination. The City declined to address the matter, and later told the media that no complaints were filed. *See correspondence attached hereto as "Exhibit A."*

20.     In November 2021, the City hired an independent investigator to explore the accusations surrounding Chief Scirotto and his discriminatory practices.

21.     In December 2021, Plaintiffs each filed a charge of discrimination with the EEOC/FCHR, alleging discrimination based upon race and sex.

22.     On February 25, 2022, the independent investigation was completed, and a formal finding issued. A summation of the outcomes concluded that "there is a very divisive atmosphere within the Department based on the perception the Chief is intentionally using race, gender and sexual orientation as attributes necessary for promotions. While the goal to diversify is an important and laudable goal it must be accomplished in a legally permissible manner. Specifically, diversity

4

must be accomplished in a manner ensuring all members' rights are protected." *See Report of Investigation In Re: EEO Complaints in FLPD Promotional Process dated February 25, 2022, attached hereto as "Exhibit B."*

23.    Scirotto was fired a week later, on March 4, 2022, "following allegations of discriminatory practices for promotions." The City announced: "We strive to be diverse in our organization. We strive to represent the community that we serve. There's just certain lawful ways to allow that diversity to happen," he [City Manager Chris Lagerbloom] said, "and in this case, the investigative report indicated we didn't quite follow the law in how we were working towards those diverse positions." *See CNN Article dated March 4, 2022. https://www.cnn.com/2022/03/05/us/fort-lauderdale-police-chief, also attached hereto as "Exhibit C."*

24.    According to the EEOC, as of April 2022, the City had not filed a response to the Plaintiffs' Charges of Discrimination. However the City, in response to an inquiry regarding the issue, informed Plaintiffs on April 4, 2022 that it had, in fact "filed a position statement with the EEOC which, candidly, is makes admissions beneficial to anyone complaining of the promotional process conducted by the former chief." *See correspondence attached hereto as "Exhibit D."*

25.    On April 27, 2022, the Plaintiffs were notified "for their information" that each was being promoted, effective May 15, 2022, with seniority (promotions back dated to September/October 2021) and back pay. However, the City had still failed to either respond to the EEOC or negotiate these acts with Plaintiffs or their Union. *See correspondence attached hereto as "Exhibit E."*

26.    At the time of the promotions, Maus, Malushi, and Fortunato were no longer on an active promotion list, and this unilateral act by the City was considered an Unfair Labor Practice and violative of the Collective Bargaining Agreement. According to the Fraternal Order of Police

("FOP"), the Union for Plaintiffs and all sworn FLPD officers at the rank of Lieutenant and below,

> the individuals named for promotion are not on any legitimate promotional eligibility list. It is the FOP's understanding that the individuals are being promoted as a result of their EEOC complaints filed against the City by the individual employees and their private attorney. Moreover, it is not the EEOC or a court of law who has ordered this promotional resolution but the agreement of the parties[1]. The City's actions in this regard are highly inappropriate, have potential for serious disruption and   are in clear violation of fundamental principles of the collective bargaining process and in violation of the parties Collective Bargaining Agreements as it relates to the promotional process.  The City cannot just unilaterally promote FOP bargaining unit members and exclude the FOP for the process. The City has chosen to intentionally exclude the FOP, a very unwise move. As such a deal has significant implications and impacts our bargaining unit members.

*See correspondence attached hereto as "Exhibit F."* The FOP further espoused that the City's unilateral change of the promotional process (promoting by fiat to avoid litigation) was considered by the FOP to be in violation of Chapter 447 of the *Florida Statutes.*

27.     As a result, claims from officers on the **active** Captain and Lieutenant lists developed, as did claims by those who were promoted before the Plaintiffs, due to the retroactive seniority and pay. As such, the City created further hostility and emotional distress by its unilateral and improper violations of the Collective Bargaining Agreement and state law governing the promotion process. *See Exhibit F.* As of the date of filing, these issues are still enduring, and attempts to settle these issues between the City and the FOP, including those which affect Plaintiffs' seniority and back pay have been ongoing, without permitting Plaintiffs to participate. This includes rescission of their seniority.

28.     The City did not file position statements with the EEOC until the end of June 2022. Those statements, contrary to the City's official positions in March and April 2022, denied any discrimination or wrongdoing by the City. *See Exhibits B, C, D, and E.*

---

[1] The City did not negotiate this or reach any agreement with Plaintiffs. As evidenced by the correspondence, the City **refused to negotiate** anything with Plaintiffs. *See Exhibit F.*

Tonja Haddad, P.A. • 315 SE 7th Street, Fort Lauderdale, FL 33301• 954.467.1223

## COUNT I- STATE LAW RACE AND GENDER DISCRIMINATION CLAIM
### UNDER § 760.10 OF THE *FLORIDA STATUTES*
### PLAINTIFF KIMBERLY MAUS

29.    Plaintiff Maus reincorporates fact Paragraphs 16-28 as if fully set forth herein.

30.    Maus is a white female who served as a Lieutenant, and at the time Scirotto became chief and commenced promoting people, was on the eligibility list to be promoted to Captain. Maus was the only female on that list.

31.    Prior to Scirotto becoming chief, Maus had already been promoted to Captain; chosen over all others on the list, but the promotion was rescinded due to the Captain for whom she was taking over not retiring; thus, she had already been deemed the most qualified for the promotion.

32.    There was only one woman at the FLPD at the rank of Captain or higher at this time. Scirotto promoted everyone on the list but her; two black males and one white male.

33.    Scirotto made his first promotion to Captain in August 2021. Instead of re-promoting Plaintiff, the Chief chose a less qualified black male, Cecil Stone[2], declaring repeatedly that he was going to change the "wall of faces" of the Command of the FLPD, stating "that wall is too white" and he's "gonna change that." He also based this choice between the two black makes on "who was darker." He contacted Maus directly and stated to her "that her 'rank provided him the opportunity for some diversity, and [he] took it. Cecil Stone is a competent black male.'" *See Report of Investigation In Re: EEO Complaints in FLPD Promotional Process dated February 25, 2022, pp. 7-9, attached hereto as Exhibit B.*

34.    The next promotion occurred on October 3, 2021, and Scirotto promoted Lt. Charlie Studders (white male) and Lt. Edgar (Eddie) Cruz (black male). As such, notwithstanding that Maus

---

[2] It should be noted that after Plaintiffs filed their discrimination charges, now Captain Stone gave the following statement to the media (which was posted with a photo of him in his FLPD uniform) "The tactics used by a few officers to discredit the promotions of Black and minority officers with master's degrees, stellar reputations, and exemplary work history, are nothing short of appalling."

7

had already once been selected as the top candidate on the list, she was the only person not promoted off the list.

35.     Cruz and Stone, the two black males, were tied for last place on the exam, and their scores were rounded up to make them eligible for the list[3]. Additionally, they both sat on Scirotto's hiring committee, and sat in on his oral boards.

36.     Maus has been a police officer since 1990; longer than anyone promoted over her, and has been with the FLPD longer than anyone promoted over her (nine years at FLPD longer than one black male, and eleven years longer than the other black male and the white male). She has also served as a Lieutenant longer than anyone promoted over her. Maus holds a degree from the prestigious Northeastern University, is a certified instructor at the police academy, and after spending two years as a patrol Lieutenant, was transferred to operations support where she supervised eight (8) units to include Motors, Mounted, Community Engagement, Homeless Outreach, and others; a position that had previously been a Captain's position that she was handling as a Lieutenant. She spent two (2) years there, and was subsequently transferred to the support services bureau, where once again she supervised at least eight (8) units to include records, evidence, court liaison, training, and others, filling what was also a Captain's position. She spent three (3) years there. As such, prior to these promotions, she spent five (5) years filling a Captain's position; no other eligible candidate had done so.

37.     The two black males' highest positions were serving in Road Patrol as Lieutenants, and the white male's highest assignment was in the Operations Bureau as a shift Lieutenant.

38.     Maus' employee evaluations going back more than a decade; even before her

---

[3] 42 U.S.C. § 2000e– (l) addresses this issue and governs prohibition of discriminatory use of test scores. It provides that: It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin. *Id.*

promotion to Lieutenant, are all outstanding, and she has performed her job with distinction. She has received sixty-four (64) commendations; thirty-two (32) public commendations and thirty-two (32) departmental commendations, two (2) officer of the month awards, and two (2) lifesaving awards; more than anyone else on the promotion list.

39.     The conduct of the City and its agents proximately, directly, and foreseeably caused Maus damages, including but not limited to lost wages and benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE Plaintiff Kimberly Maus prays that this court will:

a. award judgment against City of Fort Lauderdale for the back pay and benefits to which Maus would have been entitled but for the City's discriminatory act of passing her over for promotion;

b. award judgment against the City of Fort Lauderdale for compensatory damages, including all losses suffered as listed above;

c. award Maus all costs, including reasonable attorney's fees as delineated in § 760.11(5) of the *Florida Statutes*, and

d. grant such other and further relief as is just.

## COUNT II- STATE LAW RACE AND GENDER DISCRIMINATION CLAIM UNDER § 760.10 OF THE *FLORIDA STATUTES* PLAINTIFF LUAN MALUSHI

40.     Plaintiff Malushi reincorporates fact Paragraphs 16-28 as if fully set forth herein.

41.     Malushi is a white male who served as a Sergeant, and at the time Scirotto became chief, was on the eligibility list to be promoted to Lieutenant.

42.     At the time Scirotto took over, the ranking on the eligibility list was as follows: (1) Sgt. Newman (who had an open IA investigation pending, rendering him ineligible for promotion);

9

(2) Sgt. Malushi (Plaintiff); (2) Sgt. Vetancourt (Plaintiff); (3) Sgt. Fortunato (Plaintiff); (4) Sgt. Auguste (black male); (4) Sgt. Greenlaw (Hispanic female); (5) Sgt. Doobrow; and (5) Sgt. Gnisci.

43.     In August 2021, Scirotto made his first promotion to Lieutenant, selecting Sgt. Greenlaw (Hispanic female), who was ranked below Plaintiff and has been an officer less time than Plaintiff. She, like Lt. Maus, had previously been promoted, but also had her promotion rescinded due to the change of retirement status. On August 31, 2021, Sgt. Malushi saw Scirotto at an event and asked him why he was being passed over, and Scirotto said "I have to consider diversity and equity and this gave me an opportunity to get a female in the rank of Lieutenant." *See Exhibit B, p. 9.*

44.     The next promotions occurred in October 2021, and Scirotto promoted Sgt. Newman (open IA) and Sgt. Auguste (the black male on the list who was also a recent target of an IA investigation).

a. **Sgt. Newman:** Malushi has been an officer for nearly five (5) years longer than Newman and was, unlike Newman, eligible for promotion. Sgt. Newman left two (2) units under a cloud, including Internal Affairs (IA); a unit in which candidates are expected to serve before promotion. While Newman was in patrol, he was under investigation for a use of force incident with some of his subordinates. He was originally not promoted because he was under investigation, however he was later promoted by Scirotto while still under internal affairs investigation. The subordinates involved in the case were denied transfers to specialty units because they were under investigation. Someone being promoted while under an IA investigation is unheard of and against policy. However, upon information and belief, this promotion was a favor to a person in the department who helped Scirotto get hired, just like the two black male captains who were promoted over Lt. Maus.

Tonja Haddad, P.A. • 315 SE 7th Street, Fort Lauderdale, FL 33301• 954.467.1223

b. **Sgt. Auguste**: Malushi has been an officer for eight (8) years longer than Auguste, and employed by the City longer. Malushi was also ranked higher than Auguste on the eligibility list. Sgt. Auguste (black male) was recently being investigated, along with another officer, for attempting to badge their way into a VIP area at a Dolphin's game.

45.     Malushi has been a sworn law enforcement officer for twenty-four (24) years. He has been with the FLPD since January 2006. Prior to that, he was a member of the Detroit Police Department for eight (8) years. He began his career with the FLPD serving in the Operations Bureau as patrol officer and later served as a field training officer. During his tenure, he also served as a property crimes detective. He was promoted to the rank of sergeant in May 2013. His assignments as a sergeant included patrol and in the Office of Internal Affairs. He holds a bachelor's degree in criminal justice management from Union Institute and University. He is the recipient of an Officer of the Month award, six (6) departmental commendations and one (1) public commendation. Malushi also served nine (9) years as a Sergeant; more than any of those promoted over him, and has zero discipline history, unlike those promoted over him.

46.     Malushi was thereafter told that Scirotto said that he wanted "to punch him in the face." According to the independent investigation, this was confirmed by multiple witnesses. In his interview, Scirotto himself did not deny it but said that he was "frustrated" and that he was "likely not the only person that felt that way about Malushi." *See Exhibit B, pp. 10-11.*

47.     The conduct of the City and its agents proximately, directly, and foreseeably caused Malushi damages, including but not limited to lost wages and benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE Plaintiff Luan Malushi prays that this court will:

11

a. award judgment against City of Fort Lauderdale for the back pay and benefits to which Malushi would have been entitled but for the City's discriminatory act of passing him over for promotion;

b. award judgment against the City of Fort Lauderdale for compensatory damages, including all losses suffered as listed above;

c. award Malushi all costs, including reasonable attorney's fees as delineated in § 760.11(5) of the *Florida Statutes*, and

d. grant such other and further relief as is just.

### COUNT III- STATE LAW RACE AND GENDER DISCRIMINATION CLAIM UNDER § 760.10 OF THE *FLORIDA STATUTES* PLAINTIFF RICHARD FORTUNATO

48.     Plaintiff Fortunato reincorporates fact Paragraphs 16-28 as if fully set forth herein.

49.     Fortunato is a white male who served as a Sergeant, and at the time Scirotto became chief, was on the eligibility list to be promoted to Lieutenant. Before the August promotions were released, Fortunato received a phone call from Scirotto, during which Scirotto explained that he was taking the police department "in a different direction."

50.     At the time Scirotto took over, the ranking on the eligibility list was as follows: (1) Sgt. Newman (who had an open IA investigation pending, rendering him ineligible for promotion); (2) Sgt. Malushi (Plaintiff); (2) Sgt. Vetancourt (Plaintiff); (3) Sgt. Fortunato (Plaintiff); (4) Sgt. Auguste (black male); (4) Sgt. Greenlaw (Hispanic female); (5) Sgt. Doobrow; and (5) Sgt. Gnisci.

51.     In August 2021, Scirotto made his first promotion to Lieutenant, selecting Sgt. Greenlaw (Hispanic female), who was ranked below Plaintiff, has been an officer less time than Plaintiff, and been with the FLPD less time than Plaintiff. She, like Lt. Maus, had previously been promoted, but also had her promotion rescinded due to the change of retirement status.

12

52.     The next promotions occurred in October 2021, and Scirotto promoted Sgt. Newman (open IA) and Sgt. Auguste (the black male on the list who was also a recent target of an IA investigation).

a. **Sgt. Newman:** Fortunato has been an officer eight (8) years longer than Newman and was, unlike Newman, eligible for promotion. Sgt. Newman left two (2) units under a cloud, including Internal Affairs (IA); a unit in which candidates are expected to serve before promotion. While Newman was in patrol, he was under investigation for a use of force incident with some of his subordinates. He was originally not promoted because he was under investigation, however he was later promoted by Scirotto while still under internal affairs investigation. The subordinates involved in the case were denied transfers to specialty units because they were under investigation. Someone being promoted while under an IA investigation is unheard of and against policy. However, upon information and belief, this promotion was a favor to a person in the department who helped Scirotto get hired, just like the two black male captains who were promoted over Lt. Maus.

b. **Sgt. Auguste**: Fortunato has been an officer for twelve (12) years longer than Auguste and employed with the FLPD longer. Fortunato was also ranked higher than Auguste on the eligibility list. Sgt. Auguste (black male) was recently being investigated, along with another officer, for attempting to badge their way into a VIP area at a Dolphin's game.

53.     Fortunato commenced working for the FLPD in 1994. He has been an officer for twenty-eight (28) years; longer than anyone promoted. During his tenure, he has worked in every single district in the City, both on midnight shift and evening shift. He was a member of the Tactical Impact Unit, the Special Problems Unit, the Economic Crimes Unit, and the Bomb Squad. As a supervisor, he served in the Operations Bureau as a patrol sergeant. He holds a bachelor's degree in

criminal justice management from the Union Institute and University. He has received an Officer of the Month award, ten (10) departmental commendations, and sixteen (16) public commendations. Fortunato also served nine (9) years as a Sergeant; more than any of those promoted over him,

54.     The conduct of the City and its agents proximately, directly, and foreseeably caused Fortunato damages, including but not limited to lost wages and benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE Plaintiff Richard Fortunato prays that this court will:

a. award judgment against City of Fort Lauderdale for the back pay and benefits to which Fortunato would have been entitled but for the City's discriminatory act of passing him over for promotion;

b. award judgment against the City of Fort Lauderdale for compensatory damages, including all losses suffered as listed above;

c. award Fortunato all costs, including reasonable attorney's fees as delineated in § 760.11(5) of the *Florida Statutes*, and

d. grant such other and further relief as is just.

**COUNT IV-STATE LAW RACE AND GENDER DISCRIMINATION CLAIM
UNDER § 760.10 OF THE *FLORIDA STATUTES*
PLAINTIFF  FRANCISCO VETANCOURT**

55.     Plaintiff Vetancourt reincorporates fact Paragraphs 16-28 as if fully set forth herein.

56.     Vetancourt is a Hispanic male who served as a Sergeant, and at the time Scirotto became chief, was on the eligibility list to be promoted to Lieutenant.

57.     At the time Scirotto took over, the ranking on the eligibility list was as follows: (1) Sgt. Newman (who had an open IA investigation pending, rendering him ineligible for promotion); (2) Sgt. Malushi (Plaintiff); (2) Sgt. Vetancourt (Plaintiff); (3) Sgt. Fortunato (Plaintiff); (4) Sgt. Auguste (black male); (4) Sgt. Greenlaw (Hispanic female); (5) Sgt. Doobrow; and (5) Sgt. Gnisci.

58.     In August 2021, Scirotto made his first promotion to Lieutenant, selecting Sgt. Greenlaw (Hispanic female), who was ranked below Plaintiff and has been an officer less time than Plaintiff. She, like Lt. Maus, had previously been promoted, but also had her promotion rescinded due to the change of retirement status.

59.     The next promotions occurred in October 2021, and Scirotto promoted Sgt. Newman (open IA) and Sgt. Auguste (the black male on the list who was also a recent target of an IA investigation).

   a.  **Sgt. Newman:** Vetancourt has been an officer for three (3) years longer than Newman and was, unlike Newman, eligible for promotion. Sgt. Newman left two (2) units under a cloud, including Internal Affairs (IA); a unit in which candidates are expected to serve before promotion. While Newman was in patrol, he was under investigation for a use of force incident with some of his subordinates. He was originally not promoted because he was under investigation, however he was later promoted by Scirotto while still under internal affairs investigation. The subordinates involved in the case were denied transfers to specialty units because they were under investigation. Someone being promoted while under an IA investigation is unheard of and against policy. However, upon information and belief, this promotion was a favor to a person in the department who helped Scirotto get hired, just like the two black male captains who were promoted over Lt. Maus.

   b.  **Sgt. Auguste**: Vetancourt has been an officer for seven (7) years longer than Auguste, and with the FLPD longer. Vetancourt was also ranked higher than Auguste on the eligibility list. Sgt. Auguste (black male) was recently being investigated, along with another officer, for attempting to badge their way into a VIP area at a Dolphin's game.

60.     Vetancourt has been a member of the FLPD for twenty-three (23) years; the last thirteen (13) as a Sergeant. He has been a Sergeant longer than anyone promoted over him. He has served the department as a detective in the Street Narcotics Unit, Strategic Investigations Unit, and Street Crimes Unit, where he also served as a Sergeant. He has worked as both a patrol officer and patrol sergeant. He further held the position of sergeant in the Community Engagement Team and the Community and Traffic Services Division. Additionally, he was assigned to the Chief's Office in the Office of Internal Affairs for five (5) years. In 2017 he was transferred to the new Community and Traffic Services Division. As the sergeant in that division, he supervised the community engagement team, homeless outreach, crime prevention, and later community court. At the time the community engagement team, community court, and DUI unit were concepts the department wanted to implement. Vetancourt successfully brought all those units from concept to reality, and they are all still active units. He was also acting Lieutenant on multiple occasions. In 2020, Vetancourt was reassigned to the Office of Internal Affairs to take over for and repair the damage caused by Sgt. Newman in a national news case. He has also served as a member of the Crisis Negotiation Team and Tactical Bicycle Platoon. He is the recipient of twenty-six (26) departmental commendations and nine (9) public commendations, and has never been the subject of any discipline, unlike those chosen over him.

61.     The conduct of the City and its agents proximately, directly, and foreseeably caused Vetancourt damages, including but not limited to lost wages and benefits, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE Plaintiff Francisco Vetancourt prays that this court will:

16

a. award judgment against City of Fort Lauderdale for the back pay and benefits to which Vetancourt would have been entitled but for the City's discriminatory act of passing him over for promotion;

b. award judgment against the City of Fort Lauderdale for compensatory damages, including all losses suffered as listed above;

c. award Vetancourt all costs, including reasonable attorney's fees as delineated in § 760.11(5) of the *Florida Statutes*, and

d. grant such other and further relief as is just.

## COUNT V- TITLE VII 42 U.S.C. § 2000E-2
## DISCRIMINATION BASED ON RACE AND GENDER
## PLAINTIFF KIMBERLY MAUS

62.     Plaintiff Maus reincorporates Paragraphs 16-28 and 30-38 as if fully set forth herein.

63.     Defendant engaged in an unlawful employment practice in violation of Title VII when it denied her promotion because of her gender and race.

64.     Plaintiff, the only female on the eligibility list, and one who had already been chosen as the most qualified, was subjected to this adverse employment action for which she lost pay and suffered other damages.

65.     Defendant treated similarly situated black and male employees more favorably than Maus with respect to the promotions.

66.     Defendant's purported reasons for failing to promote Maus are pretext for race and gender discrimination. Scirotto and the City admitted the discrimination. *See Exhibits B, C, D, and E; statements by City Manager.*

67.     The effect of the failure to promote has been to deprive Maus of equal employment opportunities and otherwise adversely affect her status as an employee because of her race and gender.

68.     As a result of Defendant's unlawful discriminatory termination, Maus incurred

17

damages including, but not limited to, lost income and seniority.

69.     As a result of Defendant's unlawful discriminatory actions, Maus suffered emotional harm including, but not limited to, pain and suffering, emotional distress, anxiety, stress, and loss of enjoyment of life.

WHEREFORE, the Plaintiff, Kimberly Maus, prays that this Court grant the following relief:

a.     Provide make-whole relief to Maus, including seniority and backpay to compensate her for the loss she has suffered as a result of Defendant's discriminatory conduct alleged in this Complaint;

b.     Award Maus any prejudgment interest on the amount of lost wages and benefits determined to be due;

c.     Award damages to Maus to fully compensate her for pain and suffering caused by Defendant's discriminatory conduct alleged in this Complaint;

d.     Award costs and attorney's fees as permitted by 42 U.S. Code § 2000e–5; and

e.     Award such additional relief as justice may require.

### COUNT VI- TITLE VII 42 U.S.C. § 2000E-2
### DISCRIMINATION BASED ON RACE AND GENDER
### PLAINTIFF LUAN MALUSHI

70.     Plaintiff Malushi reincorporates Paragraphs 16-28 and 41-46, including subparts, as if fully set forth herein.

71.     Defendant engaged in an unlawful employment practice in violation of Title VII when it denied Malushi promotion because of his gender and race.

72.     Malushi, who was more qualified (and eligible) than those chosen over him was subjected to this adverse employment action for which he lost pay and suffered other damages.

73.     Defendant treated similarly situated black and female employees more favorably than Malushi with respect to the promotions.

18

74.     Defendant's purported reasons for failing to promote Malushi are pretext for gender and race discrimination. Scirotto and the City admitted the discrimination. *See Exhibits B, C, D, and E; statements by City Manager.*

75.     The effect of the failure to promote has been to deprive Malushi of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and gender.

76.     As a result of Defendant's unlawful discriminatory termination, Malushi incurred damages including, but not limited to, lost income and seniority.

77.     As a result of Defendant's unlawful discriminatory actions, Malushi suffered emotional harm including, but not limited to, pain and suffering, emotional distress, anxiety, stress, and loss of enjoyment of life.

WHEREFORE, the Plaintiff, Luan Malushi, prays that this Court grant the following relief:

a.      Provide make-whole relief to Malushi, including seniority and backpay to compensate him for the loss he has suffered as a result of Defendant's discriminatory conduct alleged in this Complaint;

b.      Award Malushi any prejudgment interest on the amount of lost wages and benefits determined to be due;

c.      Award damages to Malushi to fully compensate him for pain and suffering caused by Defendant's discriminatory conduct alleged in this Complaint;

d.      Award costs and attorney's fees as permitted by 42 U.S. Code § 2000e–5; and

e.      Award such additional relief as justice may require.

**COUNT VII- TITLE VII 42 U.S.C. § 2000E-2
DISCRIMINATION BASED ON RACE AND GENDER
PLAINTIFF RICHARD FORTUNATO**

78.     Plaintiff Fortunato reincorporates Paragraphs 16-28 and 49-53, including subparts, as if fully set forth herein.

19

79.     Defendant engaged in an unlawful employment practice in violation of Title VII when it denied Fortunato promotion because of his race and gender.

80.     Fortunato, who was more qualified (and eligible) than those chosen over him was subjected to this adverse employment action for which he lost pay and suffered other damages.

81.     Defendant treated similarly situated black and female employees more favorably than Fortunato with respect to the promotions. Defendant's purported reasons for failing to promote Fortunato are pretext for race and gender discrimination. Scirotto and the City admitted the discrimination. *See Exhibits B, C, D, and E; statements by City Manager.*

82.     The effect of the failure to promote has been to deprive Fortunato of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and gender.

83.     As a result of Defendant's unlawful discriminatory termination, Fortunato incurred damages including, but not limited to, lost income and seniority.

84.     As a result of Defendant's unlawful discriminatory actions, Fortunato suffered emotional harm including, but not limited to, pain and suffering, emotional distress, anxiety, stress, and loss of enjoyment of life.

WHEREFORE, the Plaintiff, Richard Fortunato, prays that this Court grant the following relief:

a.      Provide make-whole relief to Fortunato, including seniority and backpay to compensate him for the loss he has suffered as a result of Defendant's discriminatory conduct alleged in this Complaint;

b.      Award Fortunato any prejudgment interest on the amount of lost wages and benefits determined to be due;

20

c.      Award damages to Fortunato to fully compensate him for pain and suffering caused by Defendant's discriminatory conduct alleged in this Complaint;

d.      Award costs and attorney's fees as permitted by 42 U.S. Code § 2000e–5; and

e.      Award such additional relief as justice may require.

**COUNT VIII- TITLE VII 42 U.S.C. § 2000E-2**
**DISCRIMINATION BASED ON RACE AND GENDER**
**PLAINTIFF FRANCISCO VETANCOURT**

85.     Plaintiff Vetancourt reincorporates Paragraphs 16-28 and 49-53, including subparts, as if fully set forth herein.

86.     Defendant engaged in an unlawful employment practice in violation of Title VII when it denied Vetancourt promotion because of his race and gender.

87.     Vetancourt, who was more qualified (and eligible) than those chosen over him was subjected to this adverse employment action for which he lost pay and suffered other damages.

88.     Defendant treated similarly situated black and female employees more favorably than Vetancourt with respect to the promotions. Defendant's purported reasons for failing to promote Vetancourt are pretext for race and gender discrimination. Scirotto and the City admitted the discrimination. *See Exhibits B, C, D, and E; statements by City Manager.*

89.     The effect of the failure to promote has been to deprive Vetancourt of equal employment opportunities and otherwise adversely affect his status as an employee because of his race.

90.     As a result of Defendant's unlawful discriminatory termination, Vetancourt incurred damages including, but not limited to, lost income and seniority.

91.     As a result of Defendant's unlawful discriminatory actions, Vetancourt suffered emotional harm including, but not limited to, pain and suffering, emotional distress, anxiety,

21

stress, and loss of enjoyment of life.

WHEREFORE the Plaintiff, Francisco Vetancourt, prays that this Court grant the following relief:

      a.     Provide make-whole relief to Vetancourt, including seniority and backpay to compensate him for the loss he has suffered as a result of Defendant's discriminatory conduct alleged in this Complaint;

      b.     Award Vetancourt any prejudgment interest on the amount of lost wages and benefits determined to be due;

      c.     Award damages to Vetancourt to fully compensate him for pain and suffering caused by Defendant's discriminatory conduct alleged in this Complaint;

      d.     Award costs and attorney's fees as permitted by 42 U.S. Code § 2000e–5; and

      e.     Award such additional relief as justice may require.

## <u>JURY DEMAND</u>

The Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

          /s/ Tonja Haddad Coleman
          Tonja Haddad Coleman, Esq.
          Fla. Bar No.: 0176737
          LAW OFFICE OF TONJA HADDAD, PA
          315 SE 7th Street
          Suite 301
          Fort Lauderdale, Florida 33301
          954.467.1223
          954.337.3716 (facsimile)
          Tonja@TonjaHaddad.com
          Efiling@ TonjaHaddad.com

**Tonja Haddad Coleman**

| | |
|---|---|
| **From:** | Tonja Haddad Coleman |
| **Sent:** | Monday, November 15, 2021 1:07 PM |
| **To:** | Alain Boileau; Chris Lagerbloom; bweissman@fortlauderdale.gov |
| **Cc:** | Tonja Haddad Coleman |
| **Subject:** | Formal Complaints FLPD |
| **Attachments:** | grievance 1.pdf; grievance 2.pdf |

**Importance:** High

Mr. Boileau:

In today's newspaper, you were quoted as stating that "the city has not been provided . . . any formal written complaint from an employee, so we do not know any specific allegations." However, as evidenced by the two attached grievances served on the City Manager, the director of HR, and others in the City on October 26 and 27, 2021, that statement appears to be false. I have highlighted the germane portions of the October 26 grievance for your edification, as they seem to be specific. We will also provide these to the press if necessary. If this is not enough, please note that all of my clients are willing to come down and file formal complaints, including with the OPS if the grievance is not enough.
We hope that the City will be more forthright in the independent investigation.

*Tonja Haddad Coleman, Esq.*
Tonja Haddad, P.A.
**Advocate Building**
**315 SE 7th Street, Suite 301**
**Fort Lauderdale, FL 33301**
**954.467.1223 direct dial**
**954.337.3716 facsimile**
**Tonja@TonjaHaddad.com**
**Efiling@TonjaHaddad.com**
www.TonjaHaddad.com

The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient,  you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

1

EXHIBIT A



6840 Griffin Rd. • Davie, FL 33314 • Phone: 954.440.0908 • www.rossmanlegal.com

Chris Lagerbloom                                        25 February 2022
City Manager
City of Fort Lauderdale
100 North Andrews Avenue
Fort Lauderdale, FL 33301

Dear Mr. Lagerbloom:

On November 22, 2021 the City entered an agreement with Rossman Legal wherein this author was tasked with investigating "various complaints and allegations of workplace discrimination at the Fort Lauderdale Police Department related to recent promotions." The City was seeking an independent investigation from outside its own organizational structure. The Scope of Services called for "objective investigative services regarding the matter." In this role, I was given complete freedom to investigate the matter by "gathering and reviewing relevant records, interviewing relevant witnesses" and the agreement required "preparing a report" of my findings. This document summarizes my investigation and serves as the "report of my findings" as spelled out in the "Scope of Services."

I stand ready to discuss the report and the basis for its findings at your convenience.

Sincerely,

Gregg Rossman

EXHIBIT B

## Investigation of Complaints of Discrimination

I was advised that somewhere between four (4) to six (6) employees may have alleged a complaint or complaints invoking possible Equal Employment Opportunity Commission (EEOC) violations directly related to the matter. I was advised that four (4) employees were represented by counsel. I was provided the names of employees that "might" have relevant information. I was provided documents for review including two (2) filed "grievances", three (3) promotional eligibility lists, and a press release related to promotions. I reviewed relevant Collective Bargaining Agreements, City Codes/Ordinances, City Human Resources Department Policy, EEOC guidelines and relevant case law. I was provided a private setting to interview City employees without input or participation by City staff.

I broke out the scope of the work into several stages. First, there was a review of "governing documents" including those stated above. Second, there was a review of EEOC guidance and case law. Third, interviews were conducted with a number of employees relating to the matter. Finally, there was an independent analysis conducted by this investigator. The purpose of this report is to relate the findings of my investigation. It is the product of the above described process.

## Stage 1: Governing Document Review
## Collective Bargaining Agreements

The first grievance alleged a violation of "Article 6, Section 3." The grievance listed two classes of employees - sergeants and lieutenants - as complainants. This is significant because sergeants work under a particular collective bargaining agreement (CBA) with the City.[1] Lieutenants work under a separate CBA.[2] Upon reviewing Article 6 in each "Agreement," the language was found to be exactly the same and the relevant sections are re-stated here:

ARTICLE 6 - EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION

**Section 1**   The City and the Union agree to full and unequivocal cooperation with each other in eliminating all unlawful discrimination and to assure all personnel programs, policies, and assignments are free from unlawful discriminatory practices.

**Section 3**   There shall be no unlawful discrimination by the City in employment, employment opportunities or job actions on the basis of race, creed, color, religion, age, sex, national origin, disability, sexual orientation, gender identity, familial status or marital status, or other characteristic protected by law unless one or more of the above constitute a bona fide occupational qualification within the meaning of the law. No present employee will be unlawfully discriminated against or given preference because of any of the above characteristics, unless otherwise required by law.

---

[1] 2020-2022 Agreement between the City of Fort Lauderdale and the Fort Lauderdale Police Lodge 31 Police Officers and Sergeants.
[2] 2020-2022 Agreement between the City of Fort Lauderdale and the Fort Lauderdale Police Lodge 31 Lieutenants and Captains.

This grievance alleged a "preference given in the promotional process based on gender or race."

The second grievance likewise listed two classes of employees - sergeants and lieutenants - as complainants. Again, this is significant because both Article 36 and Article 37 are very different in the two relevant Agreements.

The second grievance simply alleged "Grievance: Article 37, Section 7 but not limited to; Candidates passed over for promotion shall have the right to appeal beginning at Step 3 of the Grievance Procedure." However, Article 37 in each CBA deals with "Shift Assignments" and has no relevance to the matter alleged.

It appears the complainants intended to invoke Article 36 – Promotional Examinations, Section 7 in the CBA pertaining to Officers and Sergeants. The grievance references some language found therein. Article 36, Section 7 in this CBA states:

> **Section 7.** Promotional scores shall be whole numbers, and the Police Chief shall have the right, when recommending appointments, to choose from the top five (5) candidates certified. Candidates passed over for promotion shall have the right to appeal beginning at Step 3 of the Grievance Procedure. If tie scores result in more than five (5) candidates being certified, the Police Chief may choose for promotion from the larger number.

This language does not exist in "Article 36 – Promotions" in the CBA pertaining to Lieutenants and Captains. Therefore, this grievance as written does not apply to any Lieutenant or Captain.

Assuming arguendo this grievance applies to all complainants listed, it appears to state a complaint about a contractual grievance process but makes no overt or implied allegation of discrimination of any kind. Therefore, this issue is outside the scope of this investigation and the author will offer no finding related to it.

## City Codes/Ordinances

The City of Fort Lauderdale codifies its commitment to protecting individuals from discrimination primarily in Chapter 29 of its Code. Chapter 29 is titled "Human Relations." Relevant sections are cited here:

ARTICLE I. - IN GENERAL
The general purpose and intent of this chapter is:

(1) To express support within the city for the policies embodied in the Broward County Human Rights Act of 2011, as amended; Titles II, III, and VII of the Federal Civil Rights Act of 1964, as amended; Title VIII of the Federal Civil Rights Act of 1968, as amended; Section 504 of the Federal Rehabilitation Act of 1973, as amended; the Civil Rights Act of 1991, as amended; the Age Discrimination and Employment Act of 1967, as amended; the Americans with Disabilities

Act of 1990, as amended; the Florida Civil Rights Act of 1992, as amended; and other federal, state, and county anti-discrimination laws; and

(2) To secure for all individuals within the city freedom from discrimination because of race, color, religion, sex, national origin, age, marital status, political affiliation, familial status, disability, sexual orientation, pregnancy, gender identity or expression, veteran or service member status, lawful source of income, or being the victim of dating violence, domestic violence, or stalking, in connection with employment, housing and public accommodations, or real estate transactions, where applicable, and thereby to promote the interests, rights, and privileges of individuals within the city.

This chapter shall be liberally construed to further the general purposes stated in this chapter. The provisions of this chapter shall be construed consistent with similar federal and state statutes and Broward County ordinances.

Sec. 29-2. - Definitions.
Aggrieved person means any person who claims to have been injured by a discriminatory practice. Discriminatory employment practice means an act that is unlawful under Article II of this chapter and Article VI, as it relates to acts made unlawful under Article II of this chapter. Discriminatory practice means an act or practice designated as unlawful under the terms of this chapter.

ARTICLE II. - DISCRIMINATION IN EMPLOYMENT
Sec. 29-11. - Discriminatory practices in employment.
(6) Discriminatory information gathering. Except as permitted by ordinance, by applicable federal, state, or county law, or by bona fide occupational qualifications, it is a discriminatory practice for an employer or employment agency:

a.  To elicit information about an employee's race, color, religion, sex, national origin, age, marital status, political affiliation, disability, sexual orientation, pregnancy, or gender identity or expression; or

The city commission shall not adopt any ordinance or regulation that authorizes an employer to disclose information that is otherwise prohibited from disclosure pursuant to federal, state, county, or local law.

The City has clearly stated in the above quoted sections that it follows federal and state law and county ordinances applicable to discrimination generally and employment discrimination specifically. The City defines discriminatory practices in employment in Article II. Of note, Section 29-11, subsection (6) declares it "discriminatory" to elicit information about an employee's race, color, religion, sex, national origin, age, marital status, political affiliation, disability, sexual orientation, pregnancy, or gender identity or expression.

## City Human Resources Department Policy
## The City's Non-Discrimination/Harassment Policies

The following Notices are taken verbatim directly from the Human Resources page on the City website. The emphasis is original as it appears on the website:

The City of Fort Lauderdale is **AN EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION EMPLOYER.** All applicants receive consideration for employment without regard to age, ancestry, color, marital status, sexual orientation, national origin, disability, political affiliation, race, religion, creed, sex or other non-merit factors (except as limited by law, Personnel Rules, Collective Bargaining Agreements, or bona fide occupational qualifications).

**Title VI Notice of Compliance**
It is the policy of the City of Fort Lauderdale, under Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973; Age Discrimination Act of 1975; Section 324 of the Federal-Aid Highway Act of 1973; Civil Rights Restoration Act of 1987; and related statutes and regulations, that no person shall on the basis of race, color, national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination or retaliation under any federally or non-federally funded program or activity administered by the City or its sub-recipients.

Although these statements do not carry the authority of an ordinance, they do make clear the City's total commitment to ensuring no individual suffers discrimination particularly within the employment practices of the City.

## Stage 2 EEOC Guidelines

The EEOC reference manual was reviewed and utilized for guidance. The following sections are taken directly from the EEOC and relevant cases.[3]

**Conducting A Thorough Investigation**
Because discrimination often is subtle, and there rarely is a "smoking gun," determining whether race played a role in the decision making requires examination of all of the surrounding facts and circumstances. The presence or absence of any one piece of evidence often will not be determinative. Sources of information can include witness statements, including consideration of their credibility; documents; direct observation; and statistical evidence such as EEO-1 data, among others.

Title VII also does not permit racially motivated decisions driven by business concerns – for example, concerns about the effect on employee relations, or the negative reaction of clients or customers. Nor may race or color ever be a bona fide occupational qualification under Title VII.

---

[3] See EEOC Compl. Man., Vol. I, Sec. 26

**Race/Color Discrimination & Work Situations**

The law forbids discrimination when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, and any other term or condition of employment.

**Potential Evidence of Racial Disparate Treatment**

*Race-related statements (oral or written) made by decisionmakers or persons influential to the decision.* Race-related statements include not only slurs and patently biased statements, but also "code words" that are purportedly neutral on their face but which, in context, convey a racial meaning. The credibility of the witnesses attesting to discriminatory statements, and the credibility of the witnesses denying them, are critical to determining whether such statements actually were made. If racially discriminatory statements were made, their importance will depend on their egregiousness and how closely they relate – in time and content – to the decision in question. For example, a statement that there are "too many Asians" in a department, made by a hiring official when discussing applicants, would be strong evidence supporting an Asian American's failure-to-hire claim. Such a statement also would support a claim of hostile work environment by Asian American employees.

*Comparative treatment evidence.* This is evidence as to whether the claimant was treated the same as, or differently than, similarly situated persons of a different race. Such evidence is not always required, but a difference in the treatment of similarly situated persons of different races is probative of discrimination because it tends to show that the treatment was not based on a nondiscriminatory reason. Conversely, an employer's consistent treatment of similarly situated persons of different races tends to support its contention that no discrimination occurred. Comparator evidence that supports either party's position must be weighed in light of all the circumstances. For example, if the group of similarly situated persons who were treated better than the claimant included persons of the claimant's race, that would weaken his or her claim, but it would not be conclusive proof of nondiscrimination because the balance of the evidence overall might still more convincingly point to discrimination. Identification of persons who are similarly situated to the claimant should be based on the nature of the allegations, the alleged nondiscriminatory reasons, and other important factors suggested by the context, but should not be based on unduly restrictive standards.

*Relevant background facts.* Specific employment decisions and issues should not be looked at in isolation. Other information that can shed light on whether the employer's adverse employment decision was motivated by race includes the employer's treatment of other employees (or customers, etc.), race-related attitudes, the work environment generally, and the context of the

challenged employment decision. The point is that background evidence can help determine the employer's state of mind and otherwise provide important context.

*Relevant personnel policies.* An employer's deviation from an applicable personnel policy, or a past practice, can support an inference of a discriminatory motive. Conversely, acting in conformance with a consistently applied nondiscriminatory policy or practice would suggest there is no such motive.

## Hiring and Promotion
The law generally leaves it to the employer's business judgment to determine who should be hired or promoted. Within that context, however, an applicant's race should not affect his or her chances. This means that employers cannot treat persons of different races differently in the hiring or promotion process. Nor may employers use selection criteria that have a significant discriminatory effect without being able to prove that the criteria are job-related and consistent with business necessity. Thus, a sound way for employers both to achieve business goals and to comply with the law is to hire and promote based on job-related ability, as measured by uniform and consistently applied qualification/selection standards.

## Uniform and Consistently Applied Standards
When making hiring and promotion decisions, employers must apply the same selection criteria to persons of different races, and apply them in the same way, giving the same weight to each criterion for each person. The reasons given for selection decisions should be credible and supported by the evidence.

## Stage 3: Summary of Interviews
### Process

The City provided a pool of "potential witnesses" made up largely from the promotional eligibility lists that were in effect at the relevant time and anyone involved in the promotional process. The pool consisted of sixty-four (64) names.

I determined the best protocol to follow would be to invite witnesses via email. This would ensure each witness received the exact same information in the invite. Each invitation contained the following information: who I was, why I was hired, the process to be followed and the voluntary nature of the invitation. The invitation stated that the meetings would be conducted in person at a Conference Room provided by the city but outside City Hall or the Police Department. It also stated that interviews could be conducted at any other location, via Zoom/WebEx or via telephone if necessary.

Based on the initial information I was provided I decided to give the Chief the first opportunity to meet with me prior to inviting or hearing from any other witnesses. His invitation clearly stated that he did not have to meet with me at all. It also stated that if he agreed to meet, I would

defer to his choice of meeting with me first or to meet with me last after all other interviews were completed. The Chief did not respond to my initial email invitation but at a later time he reached out and stated he would meet with me and we agreed he would be my last interview.

Initially, invitations were sent to twenty-four (24) potential witnesses. Twenty agreed to be interviewed. Sixteen were interviewed in person and four over the phone. If necessary, a second round of interviews were to be set however at the conclusion of these interviews I did not believe any further interviews were warranted.

Witnesses were given a choice of how and where the interview would take place. All witnesses were advised the interviews would not be recorded and no particular statement would be attributed to anyone.[4] All were advised they did not need an attorney but could bring one if they so chose. This was offered to ensure maximum cooperation. Eleven interviews were conducted in a City Conference Room, five in my office and four over the phone. Four interviews were coordinated with and attended by one attorney. These four interviews were conducted first for scheduling purposes. Interviews were taken from early December through the end of January.

Each interview began with a scripted introduction. A rubric of questions was asked of each witness. Witnesses were encouraged to answer in a narrative form to ensure the sharing of as much information as possible. Witnesses were given my contact information and encouraged to follow up with me if anything new came to mind after our interviews. Two people followed up with me after their interviews.

### Factual Findings

The interviews with twenty-one (21) witnesses (including the Chief) revealed a consistent narrative revolving around the Chief's vocalization of his outright "intention to promote diversity."[5] The following facts are deemed credible based on the convergence of facts from a broad range of witnesses, interviewed independently from one another.

The Chief on more than one occasion, to different groups of people, pointed to the wall in the Chief's conference room and stated, "that wall is too white"[6] and "I'm gonna change that." The wall displays pictures of FLPD Command Staff.[7] These statements were made in meetings involving General Staff on at least one occasion, Union members on one occasion and when considering promotions for Captain. In the first couple weeks[8] of the Chief's tenure, promotions were being considered because the promotional eligibility lists were due to expire. The Chief said he chose a few members of senior staff of varying rank to assist him in the promotional decision-making process because he was new to the agency and they had a wealth of institutional

---

[4] It would be impossible to shield the Chief from attribution. This was discussed and the Chief stated his comments could be attributed to him. Two other witnesses also agreed to being quoted directly. All witnesses discussed a fear of retribution if they spoke openly to this investigator.

[5] The credibility of the witness statements is further bolstered by Chief Scirotto's use of strikingly similar language in previous interviews for open Chief's positions. In an interview with Metro Nashville on 10/29/2020 he stated, "you have to be intentional about hiring diversity" and in talking about promotions he said leadership must "promote diversity as an intention."

[6] The faces in the group consisted of 17/18 people, 4/5 of whom were from recognized protected classes. (Ethnicity/Gender/Sexual Orientation)

[7] At the time, Fort Lauderdale PD General Staff was defined by the rank of Captain or above.

[8] It is believed the promotional interviews were conducted on or about August 18, 2021.

knowledge. The Chief invited all eligible officers to submit resumes and he invited all of them to meet in person with him and the senior staff he had chosen to assist him.

After the meeting process was completed, the Chief discussed possible promotions with the senior staff he had assembled. The Chief asked the senior staff members who they believed should be promoted. When discussing the open Captain's position, there was unanimity that the person with the second highest score from the testing process (Lt. Charlie Studders) was "very easily" the top choice based on his body of work within the Department.[9] He is a white male with twenty years tenure.

The Chief's response was reported to be:
- "not Charlie"
- "it's between these two" (pointing to the names of Stone and Cruz, two males of color)
- "this is between Cecil and Eddie" (Stone and Cruz)
- "which one is blacker"
- "this wall is too white"

One witness reportedly said, "minority status is not related to the darkness of the pigment of their skin" and "you can't choose someone based on their skin color." The Chief replied, "which one will be more acceptable to the community" or "is this an accurate reflection of the community?"

It is unclear if the Chief made the following statements in this same meeting or just after, but it was said in relation to the Captain's promotion:
- "Cecil obviously looks more black than Eddie."
- "Cecil is blacker than Eddie."

Cecil Stone was promoted to fill the open Captain's position at that time.

In relation to this promotion one of the four candidates was a white female (Lt. Kim Maus). She was told she was promoted in January of 2021 and this was published in a document titled "Memo from the Desk of Interim Chief Karen Dietrich." This document is dated January 22, 2021. This "promotion", along with three others, was invalidated by the City based on a change in status of an allegedly retiring Captain. She remained on the eligibility list when the new Chief was appointed. She was initially listed fourth out of the eligible candidates but six people were in the "Rule of Five."[10]

As stated above, the Chief employed a process to determine how to fill the open positions within the Department. There were four eligible candidates on the expiring Captain's list and there was one open Captain's position in August of 2021. The Chief consulted with senior staff and received input from them. The Chief confirmed that they all advised him that Lt. Charlie Studders, listed number two on the list, was the top choice for this position. According to the Chief, no one recommended Lt. Maus among all four eligible candidates.

---

[9] The expiring eligibility list had four names remaining on it. The Department uses a "Rule of 5" promotional tool so all four were eligible picks within the Chief's discretion despite rankings from the testing process. The second highest score was a 92. The next highest score was an 84. The two bottom scores were 80.

[10] Inexplicably the "Rule of Five" is not limited to five candidates. It could have an unlimited number of eligible candidates as there is no tie breaker among scores so theoretically every person that tests for a promotion could be eligible no matter how many people test.

The Chief personally called each candidate that was considered for promotion – not just the one being promoted.[11] Lt. Maus[12] claims the Chief told her that he "was passing her over and promoting Lt. Cecil Stone." She stated that every person previously promoted on January 22, 2021 and had that promotion rescinded was now being promoted by Chief Scirotto – except for her. Based on that, she went in and met with the Chief on August 23, 2021. She claims in that meeting the Chief said "what happened to those people was unfathomable" in relation to the rescinded promotions. She also stated the Chief told her directly that her "rank provided him the opportunity for some diversity, and I (he) took it. Cecil Stone is a competent black male." Lt. Maus stated this was a "gut punch" and was "humiliating."

Lt. Maus stated the next promotion occurred October 3, 2021. She stated the Chief called her again to advise he was not promoting her and was promoting Lt. Charlie Studders and Lt. Eddie Cruz. She stated that she challenged Chief Scirotto saying "you talk about diversity and on your wall there is only one woman." She stated the Chief replied, "I am promoting Lynette to Major"[13] and "as you can see there are not a lot of brown faces on that wall and I plan to change that."

Sgt. Malushi[14] stated that Chief Scirotto called and advised him "you are being passed over (for a promotion) for Deanna Greenlaw." He stated in this conversation the Chief then offered him praise and told him he was "respected within the organization" and to "keep doing your job. Keep doing what you are doing." Shortly after that conversation, on August 31, 2021, Sgt. Malushi saw Chief Scirotto at an event at the POA Hall and asked him "why am I being passed over?" According to Sgt. Malushi, Chief Scirotto said "I had to consider a lot of things. It was a gut punch to Deanna to lose the promotion (previously rescinded). I have to consider diversity and equity and this gave me an opportunity to get a female in the rank of Lieutenant."

Sgt. Malushi stated that on October 4, 2021 the Chief called him once again to advise that he was not being promoted into either of the two promotions he was making. According to Sgt. Malushi, their conversation went as follows:

- Chief Scirotto "I have two positions. Unfortunately, I did not select you for either. I selected Newman . . ."
- Sgt. Malushi interrupted "let me guess, Auguste."
- Chief replied, "Yes."
- Malushi "shocked"
- Chief remained quiet.
- Malushi "you're promoting a guy with an IA investigation, kicked out of Special Events, IA . . ."
- Chief "that's just where we're at"
- Malushi "I'm senior to both in overall time and rank"
- Chief "that's just where we're at"

---

[11] Past practice the Chief called the person being promoted and an Asst. Chief contacted those not chosen.
[12] She is directly quoted with permission after consultation with counsel.
[13] Referencing Captain Lynette Falzone.
[14] He is directly quoted with permission after consultation with counsel.

- Malushi "so the friends and family plan that dominated promotions . . . we bring you in to change the culture, you say you're a change agent and now under you it's the equity and diversity plan. I'm shit out of luck."
- Chief "that's just where we're at. I've made my decision – this is where we're at."

Sgt. Malushi did not have any further direct conversations with the Chief. He did hear from others after his phone call with the Chief. He was told the Chief said "who's this Malushi guy. I want to punch him in the face." A version of this statement was confirmed by multiple witnesses.

Two other witnesses described conversations with Chief Scirotto when he called to advise they were not being promoted. These statements are attributed to the Chief in those conversations:

- "You are being skipped"
- "I want to take the agency in another direction and to make it more diverse."
- "I didn't pick you. What happened to her was wrong." (re: a rescinded promotion)
- "The wall is too white."

Multiple witnesses directly described conversations with the Chief specifically related to promotions. In a meeting with Senior Staff discussing certain promotions, the Chief told a Senior Staff member that had offered his opinion on a specific choice "what do you care? You already got Steve Johnson the Spanish guy."[15] Four people related individual, private conversations that are, by their private nature, impossible to independently verify. However, when viewed within the totality of similar comments related by a multitude of witnesses and some admissions by Chief Scirotto himself, it is this investigator's belief they are credible.

Chief Scirotto agreed to meet and his interview was intentionally scheduled after all other relevant interviews had been finished. He was asked about the "promotional process" employed upon his hiring as Chief. He said he had open positions to fill immediately and that the promotional lists were expiring. He said he asked for a "90 day extension of the lists and the FOP agreed." He said, as an outsider, he was not familiar with the people eligible for promotions, that he did not have the benefit of long term, institutional knowledge. Based on that, he invited all eligible applicants to submit resumes for consideration and he invited each to meet with him. He chose senior command staff of varying rank and varying experience, along with a road patrol officer to participate in these meetings. After the interviews he discussed the candidates with the senior command staff members.[16] Chief Scirotto admitted the senior command staff he had invited to assist him in this process "unanimously agreed that Charlie was the only choice" for Captain "to fill the one open spot at that time." The Chief stated the decision was his and he believed he could use race as a "tie breaker assuming all other things are equal." He stated he considered "IA files, the resumes and the chat." He said he "choose Cecil because he was a qualified black man with a Master's degree."[17]

Chief Scirotto stated in his interview with me that he was going to "consider diversity at every opportunity." He stated that one had to be "intentional" in their decision making.

---

[15] Sgt. Steve Johnson is apparently of Trinidadian heritage.

[16] The road patrol officer was excused and did not participate in these conversations.

[17] Lt. Cecil Stone was promoted to Captain. It was confirmed he has a Master's degree.

He further stated in his interview that no one in his Command Staff recommended Lt. Maus for promotion and that he considered those recommendations when choosing who to promote.[18] The Chief admitted to making several statements about "the wall being too white." He stated the wall did not reflect the community. He said the context of the comment is built around "how do I convince the community that we are an inclusive and diverse organization if this wall is so white?" He also stated that he asked "do we not have any qualified minority candidates?" He believed these statements were made in a General Staff meeting or a meeting attended by a larger group. One witness recalled the Chief "maybe saying something about the community" in relation to the wall. No other witness recalled him making those statements. When asked if there were "Hispanic faces" or "LGBTQ" faces on the "white wall" the Chief said "he did not see diversity on the wall."[19]

The Chief was asked directly about his question "which one is blacker than the other?" When asked if he had asked that question the following exchange took place:

- Chief "in relation to promotions?"
- Investigator "promotions or any other context."
- Chief "I never said that. I would never say that."

The Chief was asked if he ever said he wanted "to punch Malushi in the face." He did not deny it but said that he was "frustrated" and that he was "likely not the only person that felt that way about Malushi."

## Conclusions

Every single witness was asked about their tenure with the Fort Lauderdale Police Department. Every witness was asked about their experience with prior promotional processes under several different Chiefs. Each and every witness stated they believed the prior promotional "processes" were fair even if the promotional decisions were not always perfect. While each person believed that historically some people were promoted based on favoritism – no one related a belief that promotions were based on immutable traits.

In speaking about the promotions that are the subject of this report, almost every witness was dissatisfied. Most believed that Chief Scirotto made clear his intention to promote based on race, gender or sexual orientation. Some believed it was about time changes were made but stated if promotions were based on things such as race it would even hurt or undermine the people promoted. Overall, there is a very divisive atmosphere within the Department based on the perception the Chief is intentionally using race, gender and sexual orientation as attributes necessary for promotions. While the goal to diversify is an important and laudable goal it must be accomplished in a legally permissible manner. Specifically, diversity must be accomplished in a manner ensuring all members' rights are protected.

---

[18] In this very same promotional process, he admittedly ignored the staff recommendations related to Charlie Studders.

[19] Among the Command Staff at the time there were four or five members of recognized classes including the following: people of color (Hispanic); gender; and LGBTQ.

The Chief's own words, admitted by him, are ill conceived if not plainly discriminatory. They are not part of a well-conceived, adopted plan of affirmative action or diversity implemented by ordinance or court order. The Fort Lauderdale Police Department has a strong history of diversity within the Department particularly within the past two decades. People in legally recognized protected classes have made it to all positions of rank including Captain, Major, Assistant Chief and Chief. Based on the collective testimony of the parties interviewed, this was accomplished most recently without any overt, intentional preference plan to promote diversity. This history is strong evidence that anyone can rise to the highest ranks within the Department based solely on merit.

CNN        Audio   Live TV   Log In

# Fort Lauderdale police chief fired over minority-first practices in hiring and promotions, report says

**By Paradise Afshar and Claudia Dominguez, CNN**

Updated 10:25 PM ET, Sat March 5, 2022



Former Fort Lauderdale Police Chief Larry Scirotto is seen in this file photo from the Fort Lauderdale Police Dept.

**(CNN)** — The city of Fort Lauderdale has fired its police chief Larry Scirotto, who has been in office for less than a year, following allegations of discriminatory practices for promotions.

Scirotto was sworn-in as police chief in mid-August, and the city had hired a law firm by November to investigate complaints of discrimination before he was fired on Thursday, according to a copy of the law firm's report obtained by CNN.

Scirotto told CNN Saturday the report that triggered his termination from the department was "vague on the facts," and was largely based on hearsay.

The investigation concluded that during his time as police chief, Scirotto implemented an approach to hiring and promotion that was unfairly focused on minority candidates.

The report said Scirotto once pointed to a conference room wall displaying photos of the department's command staff and stated, "that wall is too white," and "I'm gonna change that."

Scirotto told CNN he promoted 15 people from August to November, and of that group, six were ethnic or gender minorities selected for promotions based on their merit.

"None of them were promoted because they were in a protected class," he said. "They were promoted because they were the best candidates."

EXHIBIT C

 Audio   Live TV   LOG IN

in promoting diversity is the hill I'm going to die on, I will sleep well tonight," he said. "I won't allow them to tarnish my reputation. I won't allow them to tarnish the work that I've done in the 24 years I've been in this profession."

In one example in the report, Scirotto is alleged to have overlooked a White man with 20 years tenure with the department, and instead narrowed the choice between two men of color, and asked, "which one is blacker."

When asked about his approach to promotions, Scirotto told investigators he was going to "consider diversity at every opportunity," and he had to be "intentional" in his decision-making process.

Scirotto denied asking which candidate was "blacker" when deciding on the promotion, but admitted to making comments about the wall being "too white," because he felt it was not reflective of the community, according to the report.

"He said the context of the comment is built around 'how do I convince the community that we are an inclusive and diverse organization if this wall is so white?'" the report said.

In total, 21 witnesses, including the chief, gave a consistent narrative to investigators about Scirotto's hiring and promotion practices, the report reads. The investigation also concluded "almost every witness was dissatisfied," with Scirotto's approach to promotions, and "most believed that Chief Scirotto made clear his intention to promote based on race, gender or sexual orientation."

"Some believed it was about time changes were made, but stated if promotions were based on things such as race it would even hurt or undermine the people promoted," the report said.

The city ultimately decided to cut ties with Scirotto, who did not have a contract with the city and will not be receiving a severance, city spokesperson Stephen Gollan told CNN.

"Following a thorough and extensive investigation of employee complaints at the Fort Lauderdale Police Department, City Manager Chris Lagerbloom, has determined that it is in the City's best interest to separate employment with Larry Scirotto," the city said in a statement dated March 3.

The city's police department is now under the leadership of Acting Chief Luis Alvarez, the city said, and the selection process for a new chief is underway.

Speaking to CNN affiliate WFOR, Scirotto said the investigation was "built on hearsay," and lacked testimony, transcript and audio.

Scirotto also provided WFOR with what he said was context for his comments about the wall being "too white."

"The bottom row had several white males and one white female. And we're talking in conversation as it relates to our community and the expectation of a diverse and inclusive organization. And how do I purport we have that when the entire bottom row are white men?" Scirotto told WFOR.

| Search CNN... | 🔍 |
|---|---|

Log In

| From: | Alain Boileau |
|---|---|
| To: | Tonja Haddad Coleman |
| Cc: | Law Office of Carmen Rodriguez; Mayda Pineda |
| Subject: | Re: [-EXTERNAL-] Re: EEO Independent Investigation Report |
| Date: | Friday, April 1, 2022 8:29:21 AM |

Tonja:

My understanding is that we submitted our responses to the EEOC this week. Let me confer with my folks and I'll get back with you.

**Alain E. Boileau**
**City Attorney**
**City of Fort Lauderdale**

*Please excuse any typographical or grammatical errors as this has been sent from my iPhone in order to promptly respond to your communication*

> On Apr 1, 2022, at 8:03 AM, Tonja Haddad Coleman <tonja@tonjahaddad.com> wrote:
>
> Good morning. I hope this finds you well. I am again following up regarding the City's position statement with respect to my four clients' EEOC charges. I know the City has asked for a couple of extensions of time due to its waiting for the Rossmann report, but that has been out now for several weeks. As you can imagine, we would like to keep this moving forward. Thank you, and we look forward to your response.
>
> Tonja Haddad Coleman, Esq.
> Tonja Haddad, PA
> Advocate Building
> 315 SE 7th Street
> Suite 301
> Fort Lauderdale, FL 33301
> 954.467.1223
> www.tonjahaddad.com

> On Mar 4, 2022, at 9:38 AM, Alain Boileau <ABoileau@fortlauderdale.gov> wrote:
>
> Tonja:

EXHIBIT D

**Tonja Haddad Coleman**

| | |
|---|---|
| **From:** | Alain Boileau <ABoileau@fortlauderdale.gov> |
| **Sent:** | Monday, April 4, 2022 4:23 PM |
| **To:** | Tonja Haddad Coleman |
| **Cc:** | Law Office of Carmen Rodriguez; Mayda Pineda; Chris Lagerbloom; Tarlesha Smith |
| **Subject:** | RE: [-EXTERNAL-] Re: EEO Independent Investigation Report |

Tonja:

You need to calm down and remain professional. The 30 days is NOT for us to negotiate with you, but for us to go back and review the promotional process. To the extent we would try and negotiate a resolution as a result thereof, you have effectively chosen to close that door. Furthermore, we have filed a position statement with the EEOC which, candidly, is makes admissions beneficial to anyone complaining of the promotional process conducted by the former chief.

I am baffled by your outbursts.

**Alain E. Boileau**
**City Attorney**
100 North Andrews Avenue
Fort Lauderdale, FL 33301
(954) 828-5038 | aboileau@fortlauderdale.gov

 CITY OF FORT LAUDERDALE
CITY ATTORNEY'S OFFICE

Under Florida law, most e-mail messages to or from City of Fort Lauderdale employees or officials are public records, available to any person upon request, absent an exemption. Therefore, any e-mail message to or from the City, inclusive of e-mail addresses contained therein, may be subject to public disclosure.

1

| From: | Alain Boileau |
|---|---|
| To: | Tonia Haddad Coleman; Law Office of Carmen Rodriguez |
| Cc: | debrick.slater@eeoc.gov; Tarlesha Smith; Chris Lagerbloom; Mayda Pineda |
| Subject: | RE: Maus, Fortunato, Malushi, Vetancourt adv. Fort Lauderdale Police Department |
| Date: | Wednesday, April 27, 2022 10:27:10 AM |

Tonya:

For your information, your four clients are being advised this morning
that they are being promoted and will receive back pay.

## Alain E. Boileau

### City Attorney

100 North Andrews Avenue
Fort Lauderdale, FL 33301
(954) 828-5038 | aboileau@fortlauderdale.gov



CITY OF FORT LAUDERDALE

CITY ATTORNEY'S OFFICE

Under Florida law, most e-mail messages to or from City of Fort Lauderdale employees or officials
are public records, available to any person upon request, absent an exemption. Therefore, any e-
mail message to or from the City, inclusive of e-mail addresses contained therein, may be subject to
public disclosure.

**From:** Tonja Haddad Coleman <tonja@tonjahaddad.com>
**Sent:** Friday, April 08, 2022 2:18 PM
**To:** Law Office of Carmen Rodriguez <crpa@crlaborlawfirm.com>
**Cc:** debrick.slater@eeoc.gov; Alain Boileau <ABoileau@fortlauderdale.gov>; Tarlesha Smith
<TaSmith@fortlauderdale.gov>; Chris Lagerbloom <CLagerbloom@fortlauderdale.gov>; Mayda
Pineda <MPineda@fortlauderdale.gov>
**Subject:** [-EXTERNAL-] Re: Maus, Fortunato, Malushi, Vetancourt adv. Fort Lauderdale Police
Department

Carmen –
I did some checking on a couple of the statements in your email. It is my understanding that all the
lists are expired, and that there is not a proper way to promote any of my clients as everything
currently stands even if, as we allege, they were wrongfully skipped. As such, we are unsure what a
review of the promotional process will do. On its face, the rule of five appears to be fair and non-
discriminatory, but I think what we can all agree upon is that the manner in which it was
implemented by the former chief made it discriminatory (Unlike the new chief, who appears to just

EXHIBIT E

**Tonja Haddad Coleman**

| | |
|---|---|
| **From:** | Alain Boileau <ABoileau@fortlauderdale.gov> |
| **Sent:** | Wednesday, April 27, 2022 12:52 PM |
| **To:** | Tonja Haddad Coleman; Law Office of Carmen Rodriguez |
| **Cc:** | debrick.slater@eeoc.gov; Tarlesha Smith; Chris Lagerbloom; Mayda Pineda |
| **Subject:** | RE: Maus, Fortunato, Malushi, Vetancourt adv. Fort Lauderdale Police Department |

My notice to you was as the employer. Any issues you deem remaining can be addressed with Carmen, although from the City's standpoint, I believe we have covered everything. I also failed to advise in my last email that your clients will also have seniority dating back to the original date of promotion, and therefore, will have seniority over those promoted since that time.

## Alain E. Boileau
**City Attorney**
100 North Andrews Avenue
Fort Lauderdale, FL 33301
(954) 828-5038 | aboileau@fortlauderdale.gov

 CITY OF FORT LAUDERDALE
CITY ATTORNEY'S OFFICE

Under Florida law, most e-mail messages to or from City of Fort Lauderdale employees or officials are public records, available to any person upon request, absent an exemption. Therefore, any e-mail message to or from the City, inclusive of e-mail addresses contained therein, may be subject to public disclosure.

**From:** Tonja Haddad Coleman <tonja@tonjahaddad.com>
**Sent:** Wednesday, April 27, 2022 10:32 AM
**To:** Alain Boileau <ABoileau@fortlauderdale.gov>; Law Office of Carmen Rodriguez <crpa@crlaborlawfirm.com>
**Cc:** debrick.slater@eeoc.gov; Tarlesha Smith <TaSmith@fortlauderdale.gov>; Chris Lagerbloom <CLagerbloom@fortlauderdale.gov>; Mayda Pineda <MPineda@fortlauderdale.gov>
**Subject:** [-EXTERNAL-] RE: Maus, Fortunato, Malushi, Vetancourt adv. Fort Lauderdale Police Department

1

| | |
|---|---|
| **From:** | Eugene Gibbons |
| **To:** | Tonja Haddad Coleman |
| **Subject:** | Fwd: FOP Promotional Issues |
| **Date:** | Thursday, April 28, 2022 8:09:59 AM |

FYI

---------- Forwarded message ---------
From: **Eugene Gibbons** <gibbons@bglaw-pa.com>
Date: Thu, Apr 28, 2022 at 7:36 AM
Subject: FOP Promotional Issues
To: Chris Lagerbloom <CLagerbloom@fortlauderdale.gov>
Cc: Alain Boileau <ABoileau@fortlauderdale.gov>, Tarlesha Smith
<TaSmith@fortlauderdale.gov>, Scott Hoffer <scotthoffer@fop31.org>, Scott Moseley
<scottm@fop31.org>, Manager <manager@fop31.org>, Rob Strout <rob@fop31.org>


Dear City Manager,


Good morning. The FOP has been informed via a departmental information bulletin from
Chief Lynn that the City has now decided to promote three officers to the rank of sergeant. As
you are aware, the FOP has raised specific issues/problems related to the new sergeant
promotional eligibility list due to the fact that the City without any prior notice unilaterally
altered the assessment exercise component of the exam.


The FOP has been trying to avoid the filing of a grievance (for violation of the Promotional
Article/long standing past practice as to the assessment process) and an unfair labor practice
charge (for failing to properly notice the FOP of the City's intent to materially and
significantly change the exercise that counts for half of the final promotional score).
However, to date we have not received any acknowledgement whatsoever to my email sent on
Monday April 25, 2022 wherein we requested an extension to file our grievance and in-person
meeting. Our intent is to work with the City not against it to avoid unnecessary labor strife but
the City seems to be forcing our hand.


Furthermore, the FOP has been informed via the same information bulletin that the City
intends to create four new budgeted positions (3 Lieutenants and 1 Captain) and promote
outside of the process contained in the Collective Bargaining Agreement. The Lieutenants and
Captain individuals named for promotion are not on any legitimate promotional eligibility list.
It is the FOP's understanding that the individuals are being promoted as a result of their EEOC
complaints filed against the City by the individual employees and their private attorney.


Moreover, it is not the EEOC or a court of law who has ordered this promotional resolution

**EXHIBIT F**

but the agreement of the parties. The City's actions in this regard are highly inappropriate, have potential for serious disruption and are in clear violation of fundamental principles of the collective bargaining process and in violation of the parties Collective Bargaining Agreements as it relates to the promotional process. The City can not just unilaterally promote FOP bargaining unit members and exclude the FOP for the process. The City has chosen to intentionally exclude the FOP, a very unwise move. As such a deal has significant implications and impacts our bargaining unit members.

I hope the City will pause what it is about to unilaterally do and sit down, discuss and work through these very serious issues with the FOP before it is too late.

Respectfully,

Gene

--
**BG Law**
Eugene G. Gibbons
*Buschel Gibbons, P.A.*
501 East Las Olas Boulevard
Suite #304
Fort Lauderdale, FL 33301
(954) 530-5301
   www.BGLaw-pa.com

--
**BG Law**
Eugene G. Gibbons
*Buschel Gibbons, P.A.*
501 East Las Olas Boulevard
Suite #304
Fort Lauderdale, FL 33301
(954) 530-5301
   www.BGLaw-pa.com

**IN THE CIRCUIT COURT OF THE 17ᵀᴴ JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY, FLORIDA**

Case No: _22-14269_

Kimberly Maus; Luan Malushi
Francisco Vetancourt; Richard Fortunato

Plaintiff

Judge Division: _04_

VS

City of Fort Lauderdale

Defendant

**CLERK'S CERTIFICATE OF COMPLIANCE**

FILED
SEP 23 2022

I hereby certify that pursuant to Administrative Order, No. 2020-73Civ/2020-74-UFC:
"**ADMINISTRATIVE ORDER DIRECTING CLERK OF COURTS WITH REGARD TO DISMISSED CIVIL OR FAMILY CASES**",

**The Clerk has conducted a search for all previous existing civil cases related to these two parties.**

**Listed below are all the aforementioned related cases:**

NONE

Brenda D. Forman
Circuit and County Courts

By: _____

Deputy Clerk

Filing # 158172755 E-Filed 09/27/2022 09:16:04 AM

IN THE CIRCUIT COURT FOR THE
SEVENTEENTH JUDICIAL CIRCUIT, IN
AND FOR BROWARD COUNTY, FLORIDA

KIMBERLY MAUS, LUAN MALUSHI,
RICHARD FORTUNATO, and
FRANCISCO VETANCOURT,

CASE NO.: CACE 22-014269

               Plaintiffs,

JUDGE: PERLMAN

vs.

CITY OF FORT LAUDERDALE,

               Defendant.

_____/

## SUMMONS IN A CIVIL ACTION

**TO:   CITY OF FORT LAUDERDALE**
       **C/O MAYOR OF CITY OF FORT LAUDERDALE**
       **100 NORTH ANDREWS AVENUE**
       **FORT LAUDERDALE, FL 33301**

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint/petition with the clerk of this circuit court. A phone call will not protect you. Your written response, including t h e case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office(listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the plaintiff/petitioner named below.

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator in the Administrative Office of the Court, 201 Southeast 6th Street, Fort Lauderdale, Florida 33301, telephone 954.831.7721, within two (2) working days of your receipt of this Complaint; if you are hearing or voice impaired, call 1-800-955-8771.

TONJA HADDAD, PA
315 SE 7th Street, Suite 301 Fort
Lauderdale, Florida 33301
954.467.1223
954.337.3716 (facsimile)
Tonja@TonjaHaddad.com Attorney
for Plaintiff

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this summons and a copy of the complaint in this lawsuit on the above-named defendant.

SEP 30 2022

(SEAL)
CLERK OF THE CIRCUIT COURT

By:___
Deputy Clerk

BRENDA D. FORMAN

2

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO.: CACE-22-014269 Div. 04

KIMBERLY MAUS, LUAN MALUSHI,
RICHARD FORTUNATO, and
FRANCISCO VETANCOURT,

     Plaintiffs,

v.

CITY OF FORT LAUDERDALE,

     Defendant.

_____/

## NOTICE OF APPEARANCE AND
## DESIGNATION OF E-MAIL ADDRESS

PLEASE TAKE NOTICE that the undersigned counsel, Law Offices of Carmen Rodriguez,

P.A., hereby gives notice of its appearance as counsel of record for and on behalf of Defendant CITY

OF FORT LAUDERDALE, in this action. The undersigned requests that copies of all pleadings,

notices, correspondence, and communications of any type, be furnished to her in accordance

therewith.

In addition, Law Offices of Carmen Rodriguez, P.A., hereby designates the following primary

email address to be used for mandatory electronic service pursuant to Rule 2.516 of the Florida Rules

of Judicial Administration: crpa@crlaborlawfirm.com.

Case No. CACE-22-014269 Div. 04

Dated: October 3, 2022                    Respectfully submitted,

                                  s/ Carmen Rodriguez
                                  Carmen Rodriguez, Esq. (FBN 710385)
                                  Email: crpa@crlaborlawfirm.com
                                  Law Offices of Carmen Rodriguez, P.A.
                                  15715 S. Dixie Highway, Suite 411
                                  Palmetto Bay, Florida 33157-1884
                                  Telephone:  (305) 254-6101
                                  Facsimile:  (305) 254-6048
                                  Attorneys for Defendant

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing was served via an automatic email generated by the Florida Courts E-Filing Portal on Tonja Haddad Coleman, Esq., Law Office of Tonja Haddad, P.A., 315 SE 7 Street, Suite 301, Fort Lauderdale, Florida 33301, Email address: Tonja@tonjahaddad.com: efiling@tonjahaddad.com, on this 3rd day of October, 2022.

                                  s/Carmen Rodriguez
                                  Carmen Rodriguez

2